UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| CARLOS D'JUAN CAMPBELL, JR., )<br>)<br>   Petitioner, )<br>)<br>v. )<br>)<br>KEVIN GENOVESE, Warden, )<br>)<br>   Respondent. ) | No. 3:20-CV-00394-JRG-DCP |

## **MEMORANDUM OPINION**

This is a pro se prisoner's petition for habeas corpus relief filed pursuant to 28 U.S.C. § 2254 in which Petitioner challenges his conviction for two counts of attempted first-degree murder and one count of employing a firearm during the commission of a dangerous felony. After reviewing the relevant filings, including the state court record, the Court finds that the record establishes that Petitioner is not entitled to relief under § 2254. Accordingly, no evidentiary hearing is warranted, *see* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), the petition for habeas corpus relief will be **DENIED**, and this action will be **DISMISSED**.

### I.    PROCEDURAL HISTORY

A Knox County grand jury indicted Petitioner on seven counts of attempted first-degree murder, two counts of employing a firearm during the commission of a dangerous felony, and two counts of felony reckless endangerment. *Campbell v. State*, No. E201801877CCAR3PC, 2019 WL 5858141, at *1 (Tenn. Crim. App. Nov. 8, 2019), *appeal denied* (Apr. 16, 2020). The State dismissed the two counts of felony reckless endangerment prior to trial. *Id.* Petitioner was convicted of two counts of attempted first-degree murder, one count of employing a firearm during

the commission of a dangerous felony, and five counts of misdemeanor reckless endangerment, and the trial court sentenced Petitioner to serve forty-six years. *Id*. at *2.

On direct appeal, the Tennessee Court of Criminal Appeals ("TCCA") affirmed Petitioner's convictions for attempted first-degree murder and employing a firearm during the commission of a dangerous felony. *Id*. The TCCA reversed and dismissed the convictions for misdemeanor reckless endangerment on the basis that misdemeanor reckless endangerment is not a lesser included offense of attempted first-degree murder. *Id*. The Tennessee Supreme Court denied Petitioner's application for permission to appeal. *Id*. The United States Supreme Court denied certiorari. *Campbell v. Tennessee*, No. 16-5256, 137 S. Ct. 212 (Mem) (Oct. 3, 2016).

Petitioner filed a timely petition for post-conviction relief with the Knox County Criminal Court, and his petition was denied. *Campbell*, 2019 WL 5858141, at *1. Petitioner appealed to the TCCA. *Id*. at *8. Petitioner asserted that (1) he received ineffective assistance of counsel at trial, and (2) the post-conviction court erred in allowing the State to present proof and argument at the post-conviction hearing after the State failed to file a written response to his petition. *Id*. at *1. The TCCA concluded that trial counsel was deficient on two issues raised by Petitioner, but the deficiencies were not prejudicial. *Id*. at *21. The TCCA also concluded that the post-conviction court did not abuse its discretion in allowing the State to present proof and argument at the post-conviction hearing, and Petitioner had not shown he was prejudiced by the State's failure to file a written response to his petition. *Id*. at *22. The Supreme Court of Tennessee denied Petitioner's application for permission to appeal. [Doc. 8-28].

Petitioner timely filed a writ of habeas corpus with this Court on September 1, 2020. [Doc. 1].

2

Case 3:20-cv-00394-JRG-DCP   Document 11   Filed 02/23/21   Page 2 of 20   PageID #: 3200

## II.     BACKGROUND

On direct appeal, the TCCA summarized the facts of this case as follows:

> At 3:15 a.m. on August 13, 2012, the Knox County Emergency Communications District began to receive 911 calls about a shooting at a residence on Wilder Place in Knoxville. Officers C. Cadet Hutton and Jeff Hopkins of the Knoxville Police Department (KPD) responded to the home. The officers found parked "on the north side" of the house a black Nissan Maxima with "a bullet hole near the gas tank ... on the driver's side." They also found a silver Lincoln that belonged to Devante Nail "parked on the east side of the house" that "had been struck approximately six times down the driver's side quarter panels from the front to the rear." Officer Hutton testified that it appeared that no one was in the cars when they were shot.
>
> The officers found ten Smith and Wesson .40 caliber shell casings "spread out" at a nearby intersection. They also found "two large chunks of grass that were torn up" in the yard next to the silver Lincoln. Officer Hutton opined that the chunks of grass could have "possibly [been from] shotgun blasts." Officer Hutton testified that the house had been struck by two bullets, once on "the corner of the house" and once on "the east side of the house facing Wilder Place." However, Officer Hutton testified that the bullets "actually entered the wall but did not make it all the way through [to the inside of] the residence."
>
> Officer Hopkins testified that when they arrived at the house, Mr. Nail was the only person standing outside. Officer Hopkins recalled that there were three other people in the house that morning and that they told him that they "[h]ad heard nothing." Officer Hutton testified that "[e]verybody inside was okay, nobody had been struck by gunfire." Officer Hutton did not see any bullet holes inside the house, but Officer Hutton did recall seeing a box of twelve gauge shotgun shells on the living room table.
>
> Brittaney Nail was the only victim to testify at trial. Ms. Nail testified that on August 13, 2012, she was living with her sister, Lakeshia Reynolds, at the house on Wilder Place. Ms. Nail also testified that Mr. Nail was her brother. According to Ms. Nail, she was at the house that morning with Ms. Reynolds; Ms. Reynolds's friend, Tamichael Bennett; Mr. Nail; and Mr. Nail's girlfriend, Darlessa Clemons. Ms. Nail testified that she had slept on the couch while Mr. Nail and Ms. Clemons were in Mr. Nail's bedroom, and Ms. Reynolds and Mr. Bennett were in Ms. Reynolds's bedroom.

3

Ms. Nail recalled that she woke up to Ms. Reynolds asking if she had heard a noise. Ms. Nail testified that the next thing she remembered was the police knocking on the door because "the neighbor had called the police [and] said they heard shooting." Ms. Nail admitted that she did not hear "any shooting" that morning. Ms. Nail testified that the next morning she saw the damage to the two cars and "a couple of holes" on the side of the house.

At 2:29 a.m. on August 15, 2012, the Knox County Emergency Communications District began receiving 911 calls about another shooting at the Wilder Place residence. Ms. Nail testified that on the morning of August 15, 2012, she and Ms. Clemons were the only people in the house. Ms. Nail recalled that they were awake, with several lights on in the house, and watching movies in the living room that morning. Ms. Nail admitted that there were no cars parked in front of the house and that the windows had dark curtains. According to Ms. Nail, she was sitting on a couch pushed up against a window with her "front towards the window," and Ms. Clemons was next to her "with her back towards the window," when "all of a sudden, [they] just heard gunshots and [saw] the plaster from the walls going everywhere."

Ms. Nail testified that she and Ms. Clemons got on the ground and waited for the shooting to end. Ms. Nail stated that she was "really just scared" and shocked during the shooting. Once the shooting ended, Ms. Clemons called Mr. Nail and told them to call the police. Ms. Nail then called 911, and during the call, she told the 911 operator that she saw who had shot at the house and recognized his face. Ms. Nail then said that the Defendant was the shooter. Ms. Nail admitted at trial that she had not actually seen the shooter that night. Ms. Nail explained that she told the 911 operator that the Defendant had shot at the house because Ms. Clemons told her that she had heard the Defendant's name "a lot in conversation."

Officer Hopkins testified that he responded to the shooting on August 15, 2012. Officer Hopkins testified that the house "was riddled with gunshots" with "pieces of drywall just scattered all over the place indicating that it had been struck multiple times." Officer Hopkins also testified that Ms. Clemons had "a through and through hole in her shirt" and a "scratch mark" on her back where, Officer Hopkins opined, a bullet had almost struck her. Ms. Nail testified that the next day, she found bullet holes in the bathroom in addition to the ones in the living room that the police had photographed.

4

KPD Investigator Chas Terry testified that he investigated the shootings at the Wilder Place house. Inv. Terry testified that when he went to the house after the August 15, 2012 shooting, he "saw numerous bullet holes throughout the entire house," including "the bedroom, kitchen, [and] living room." Inv. Terry also found a bullet "that had gone through the length of the house, gone out of the back door, [and] landed in a trash can." An "additional fragmented round" was also found inside the house.

Inv. Terry testified that he questioned the Defendant about the shootings on August 26, 2012. Inv. Terry testified that he advised the Defendant of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and that the Defendant signed a "rights waiver" form. Inv. Terry recalled that the Defendant initially denied any involvement in the shootings, but by the end of the questioning, he told Inv. Terry that Cuben Lagrone was the shooter and that "he simply drove."

Inv. Terry testified that he interrogated the Defendant again in October 2012 after the Defendant signed a second "rights waiver" form. Inv. Terry stated that he was assisted by KPD Investigator Brandon Wardlaw during portions of that interrogation. Inv. Terry testified that during the October 2012 interrogation, the Defendant stated "once again, [that] he was driving" during the shootings and that Cuben was the shooter. Inv. Terry further testified that the Defendant never admitted to him that he shot at the house during either of the interrogations. Inv. Terry also explained that it took around fifteen minutes to get from the Defendant's neighborhood to Wilder Place. An approximately fifty-minute excerpt of the October 2012 interrogation was played for the jury.

During the excerpt played for the jury, the Defendant stated that from what he knew, the conflict between Cuben Lagrone and Mr. Nail started when Mr. Nail's little brother "got jacked." The Defendant explained that Mr. Nail's brother "got robbed" but that his friends lied about making Mr. Nail's brother "get naked." The Defendant further explained that Mr. Nail's brother had "walked up on the car" and "was mugging and stuff." The Defendant claimed that he never left the car but that one of his friends told Mr. Nail's brother to empty his pockets, and Mr. Nail's brother emptied his pockets and they "took his cell phone."

The Defendant then stated that Mr. Nail came to the Mechanicsville neighborhood of Knoxville "three or four times" and shot at a house "twice." The Defendant claimed he was not in Mechanicsville for any of the occasions when Mr. Nail and his

5

friends were there. The Defendant further claimed that "some people would call" him bragging about the shootings and threatening him. The Defendant told the investigators that Mr. Nail repeatedly said that "he was gonna shoot" him.

The Defendant also stated that Mr. Nail's little brother "was talking s—t on Twitter" about how "[t]hey was ... gonna kill" a "little dude" that lived in Mechanicsville. The Defendant then detailed an ongoing Twitter exchange with people from the "east side" and stated that he told Mr. Nail that he "didn't want no problems with him."

The Defendant admitted to driving the car during the shootings at the Wilder Place house. The Defendant stated that Cuben told him how to get to the house and admitted that a third man, Quinton, was in the car with them. The Defendant also stated that he was driving a white car. The Defendant said that he did not know how Cuben and Quinton knew that Mr. Nail would be at the Wilder Place house and that they had "s—t that they [did not] tell [him] all the time." The Defendant said he "guess[ed]" that Cuben and Quinton wanted to shoot at the house because Mr. Nail put their "name[s] in [a] Tweet" that said "F—k the Ville."

The Defendant told the investigators that as they drove past the house on Wilder Place, Cuben and Quinton "start[ed] shooting" and shot "a whole clip." The Defendant said that he could not remember where they went after the shooting. The Defendant denied calling anyone to say "we done bust 'em back." Inv. Terry stated that an hour after the first shooting his "phone was blowing up" with messages that the Defendant, Cuben, and Quinton "shot up that house." Inv. Terry then asked what Mr. Nail did after the first shooting "to get back at y'all" to make them go over there a "second time."

The Defendant said that Mr. Nail came to Mechanicsville "two cars deep." The Defendant claimed that he was not there at the time, but he was told that Mr. Nail came "strapped up" and "looking for" him, Cuben, and Quinton. The Defendant also claimed that "they shot ... at [him] on the east side." However, the Defendant then claimed that he did not know that the house "got shot up twice" or the reason for the second shooting. Inv. Wardlaw said that there were actually three shootings at the house, but only two were reported. Inv. Terry then told the Defendant that he had "just told" them that he "drove both times."

6

After that, the Defendant admitted that he was in the white car again for the second shooting and that Cuben and Quinton were both with him. The Defendant also admitted that a juvenile was with them that night. The Defendant then said that they went to the house on Wilder Place because Quinton said Mr. Nail was at the house and that "they started shooting." The Defendant "guess[ed]" that they shot "the clip" again. The Defendant stated that they "went to the crib probably" after the shooting. The Defendant reiterated that both times he was "just driving" and that he did not "shoot up cribs."

Inv. Wardlaw testified he was present for portions of the Defendant's October 2012 interrogation and that the Defendant "said that he only was the driver and he never shot at anyone." Inv. Wardlaw testified that he was present at a May 2013 suppression hearing in this case and that at the suppression hearing, the Defendant testified that "he actually was one of the shooters." Trial counsel did not object to this testimony.

Patricia M. Resig, a firearms examiner for the KPD, testified as an expert witness in firearms identification. Ms. Resig testified that she examined the ten Smith and Wesson .40 caliber casings recovered after the August 13, 2012 shooting and that all ten casings had been fired from "the same unknown gun." With respect to the August 15, 2012 shooting, Ms. Resig testified that she examined two .40 caliber bullets that she opined had been fired from a Glock handgun, a .380 caliber casing that she found "no matches" for, and a 9 mm casing and bullet.

Ms. Resig testified that she was able to match the 9 mm casing to a Ruger pistol seized from Cuben Lagrone and that the bullet "could have been fired" from the Ruger pistol, but "there was a lack of sufficient matching individual characteristics" for her to "say it was indeed fired through that" gun. Ms. Resig opined that, in all, three guns had been used during the August 15, 2012 shooting.

Based upon the foregoing evidence, the jury convicted the Defendant of five counts of misdemeanor reckless endangerment and acquitted him of the charge of employing a firearm during the commission of a dangerous felony for the August 13, 2012 shooting. For the August 15, 2012 shooting, the jury convicted the Defendant of two counts of attempted first degree murder and one count of employing a firearm during the commission of a dangerous felony.

At the sentencing hearing it was established that the Defendant had two convictions for simple possession of marijuana as an adult. The Defendant's juvenile record was much more

7

Case 3:20-cv-00394-JRG-DCP   Document 11   Filed 02/23/21   Page 7 of 20   PageID #: 3205

extensive. In 2007, the Defendant was adjudicated delinquent for committing aggravated robbery and vandalism of $500 or less. In 2008, he was adjudicated delinquent for conspiracy to commit aggravated robbery and also had his probationary sentence revoked. In 2009, the Defendant was adjudicated delinquent for committing aggravated assault and unlawful possession of a weapon. In 2010, he was adjudicated delinquent for committing reckless endangerment with a deadly weapon and vandalism valued at more than $500 but less than $1,000. Also at the sentencing hearing, the Defendant admitted to being present at both shootings and shooting at the house on August 13, 2012, but denied doing so on August 15, 2012.

In sentencing the Defendant, the trial court applied the following enhancement factors to all of the Defendant's convictions: (1) the Defendant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range; (3) the offenses involved more than one victim; (8) the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; (13) the Defendant was released on bail at the time the felony offenses were committed; and (16) the Defendant had been adjudicated to have committed delinquent acts as a juvenile that would constitute felonies if committed by an adult. *See* Tenn.Code Ann. § 40–35–114. The trial court also found that the Defendant had no hesitation about committing a crime when the risk to human life was high with respect to the misdemeanor reckless endangerment convictions. *See* Tenn.Code Ann. § 40–35–114(10).

The trial court sentenced the Defendant to eleven months and twenty-nine days for each of the misdemeanor reckless endangerment convictions, twenty years for each of the attempted first degree murder convictions, and the mandatory minimum six years for the employing a firearm during the commission of a dangerous felony conviction. The trial court also found that consecutive sentences were warranted because the Defendant was a dangerous offender and had an extensive history of criminal activity. *See* Tenn.Code Ann. § 40–35–115(b)(2), (4). The trial court ordered the Defendant's sentences for his attempted first degree murder convictions and employing a firearm during the commission of a dangerous felony conviction to run consecutively. The trial court further ordered that the Defendant's sentences for his misdemeanor reckless endangerment convictions run concurrently to his felony convictions, for a total effective sentence of forty-six years.

8

*State v. Campbell*, No. E2014-00697-CCA-R3-CD, 2015 WL 6155893, at *1–*5 (Tenn. Crim. App. Oct. 20, 2015).

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified in 28 U.S.C. § 2254, *et. seq.*, a district court may not grant habeas corpus relief for a claim that a state court decided on the merits unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

The § 2254(d) standard is a hard standard to satisfy. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully demanding standard . . . 'because it was meant to be'") (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)). When evaluating the evidence presented in State court, a federal habeas court presumes the correctness of the State court's factual findings unless the petitioner rebuts that presumption with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

## III. ANALYSIS

Petitioner asserts three claims of ineffective assistance of his trial counsel: (1) trial counsel failed to object to Investigator Wardlaw's trial testimony regarding Petitioner's suppression hearing admission of shooting at the residence; (2) trial counsel failed to sever the offenses that occurred on August 13, 2012 from those that occurred on August 15, 2012; and (3) trial counsel failed to request specific jury instructions. [Doc. 1].

9

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This includes the right to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. A petitioner has the burden of proving ineffective assistance of his counsel. *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. To meet this prong, a petitioner must demonstrate that his counsel was so deficient that he no longer "function[ed] as the 'counsel' guaranteed under the Sixth Amendment." *Id.* at 687. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires a claimant to show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

The Supreme Court has emphasized that a claimant must establish both prongs of a claim for ineffective assistance of counsel to meet his burden, and if either prong is not satisfied, the claim must be rejected. *Id.* at 687. Moreover, a habeas petitioner alleging ineffective assistance of counsel bears a heavy burden, given the "doubly deferential" review of a such a claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### A. Suppression Hearing Testimony

Petitioner asserts that trial counsel was ineffective by failing to object to Investigator Wardlaw's testimony regarding Petitioner's suppression hearing admission of being a shooter on August 15, 2012. Trial counsel's failure to object was deficient, but the TCCA did not unreasonably apply the prejudice prong of *Strickland*. Thus, Petitioner is not entitled to relief under § 2254.

When a defendant testifies in a suppression hearing to protect a constitutional right, the testimony may not be used against the defendant at trial unless the defendant makes no objection. *Simmons v. United States*, 390 U.S. 377, 394 (1968). If trial counsel had objected to Investigator Wardlaw's testimony at trial regarding Petitioner's suppression hearing admission, his admission would have been excluded. Thus, trial counsel was deficient by failing to object to Investigator Wardlaw's testimony at trial regarding Petitioner's admission of shooting at the residence.

Petitioner claims that trial counsel's deficient performance prejudiced his defense by leading to convictions. Petitioner argues that the substantial difference in the convictions related to the events of August 13, 2012 as compared to the events of August 15, 2012 evidences the impact of Petitioner's admission of being a shooter in the latter event. The TCCA disagreed:

> Given the evidence presented at trial, a rational jury could have found that because the two gunshots at the residence did not penetrate the interior of the home and because no one was injured during the August 13, 2012 shooting, it was unreasonable to find the

11

> Petitioner guilty of anything greater than misdemeanor reckless endangerment. A jury could have easily found that compared to the injuries to person and property associated with the August 15, 2012 shooting, the August 13, 2012 shooting was much less serious. Because there was substantial independent evidence, other than Investigator's Wardlaw's testimony about the Petitioner's confession at the suppression hearing, that tended to show that the Petitioner's statement that he drove the shooters to the scene was trustworthy and that sufficiently linked the Petitioner to the crime, we conclude that the Petitioner has failed to show that trial counsel's deficiency on this issue was prejudicial.

*Campbell*, 2019 WL 5858141, at *15.

The question before the Court is whether the TCCA's application of the prejudice prong of *Strickland* was unreasonable. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The TCCA's analysis precludes relief under § 2254 if "fairminded jurists could disagree" on whether the TCCA's analysis was correct. *Id.* (quoting *Yarbrough v. Alvarado*, 541 U.S. 652, 664 (2004)). Furthermore, the range of reasonable applications under *Strickland* is substantial. *Harrington*, at 105. When analyzing the prejudice prong under *Strickland*, the TCCA was tasked with determining whether Petitioner demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The standards under *Strickland* and § 2254 are both "highly deferential" and are "doubly" so when applied in tandem. *Harrington*, at 105.

Petitioner failed to demonstrate a reasonable probability that the result of his trial would have been different if not for trial counsel's deficient performance. As discussed by the TCCA, there was "substantial independent evidence" with which to convict Petitioner, including his own

12

admissions to driving the shooters to the scene. Thus, Petitioner did not meet his burden, and the TCCA's application of the prejudice prong of *Strickland* was not unreasonable.

Petitioner further argues that the TCCA overlooked the significance of the jury acquitting him of employing a firearm during a dangerous felony for the events on August 13, 2012. The jury convicted Petitioner of five counts of misdemeanor reckless endangerment for the August 13, 2012 shooting. Misdemeanor reckless endangerment is not dangerous felony under the relevant statute. Tenn. Code Ann. § 39-17-1324 (West). Thus, the jury could not convict Petitioner of employing a firearm during a dangerous felony as a result of his conduct on August 13, 2012, s*ee id.*, and Petitioner's acquittal for such is irrelevant. The difference in convictions from the August 13, 2012 shooting as compared to the August 15, 2012 shooting was most likely the result of the seriousness of the latter offense. Even if the Court was to conclude that Petitioner's argument had merit, it is clear from the TCCA's decision that fairminded jurists could disagree, which precludes federal habeas corpus relief. Petitioner is not entitled to relief under § 2254.

### 1. Law-of-the-Case Doctrine

Petitioner also claims the TCCA misapplied the federal law-of-the-case doctrine by revisiting the issue of corroboration of his extrajudicial confessions when examining the prejudice prong under *Strickland*. Under Tennessee law, "a person cannot be convicted solely on the basis of an uncorroborated extrajudicial confession." *State v. Bishop*, 431 S.W.3d 22, 61 (Tenn. 2014). Upon direct appeal from his convictions, Petitioner argued that there was no evidence to corroborate his confessions. *Campbell*, 2015 WL 6155893, at *16. The TCCA concluded that since trial counsel had not objected to Petitioner's suppression hearing confession, that confession could be used to corroborate his extrajudicial confessions. *Id.* at *17. The TCCA provided no other evidence to support the extrajudicial confessions. *Id.*

13

Upon appeal of the denial of Petitioner's post-conviction relief, the TCCA held that trial counsel was deficient for failing to object to Investigator Wardlaw's testimony regarding Petitioner's suppression hearing confession. *Campbell*, 2019 WL 5858141, at *14. The TCCA concluded that trial counsel's failure was not prejudicial given there was sufficient additional evidence to corroborate Petitioner's extrajudicial confessions and link him to the crime:

> At trial, the State presented the Petitioner's statement to police that he had driven the shooters to the Wilder Place residence on August 13, 2012 and August 15, 2012. Brittaney Nail testified that on August 15, 2012, she was watching movies with Darlessa Clemons inside the Wilder Place residence when numerous bullets pierced the drywall of her home. Ms. Nail said that she told the 9-1-1 operator that the Petitioner was responsible for the August 15, 2012 shooting because Clemons had told her that she heard the Petitioner's name "a lot in conversation." Ms. Nail added that she knew the Petitioner and Devante Nail "had something between each other." Officer Hopkins testified that upon his arrival, he noticed that the inside of the Wilder Place residence "was riddled with gunshots" and "there were pieces of drywall just scattered all over the place." He stated that Darlessa Clemons had "a through and through hole in her shirt" and a "scratch mark" on her back where he opined that a bullet had nearly struck her. Investigator Chas Terry testified that he observed "numerous bullet holes throughout the entire house." Patricia Resig, an expert in firearm identification, opined that three guns had been used during the August 15, 2012 shooting. Numerous photographs were admitted showing the bullet holes and damage that these bullets caused to the residence, the hole in Clemons' shirt, and Clemons' injury. Although the Petitioner contends that Nail and Clemons were biased against him because they knew about the feud between the Petitioner and Devante Nail and had reason to embellish or fabricate evidence against him, we conclude that all of the aforementioned evidence, when viewed together, tends to show that the Petitioner's admission to driving the shooters on August 13, 2012 and August 15, 2012 was trustworthy.

*Id.* at *15.

The law-of-the-case doctrine is an amorphous concept. *Arizona v. California*, 460 U.S. 605, 618 (1983). It provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Id.* The doctrine

"merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Messinger v. Anderson*, 225 U.S. 436, 444 (1912). A court can revisit its prior decisions, "although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona v. California*, 460 U.S. at 618). Nevertheless, "[t]he doctrine of the law of the case . . . does not foreclose a court from reconsidering issues in a case previously decided by the same court . . . ." *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990).

The TCCA was within its discretion to revisit the issue of corroborating evidence. The TCCA disposed of Petitioner's claim on direct appeal without discussing evidence other than Petitioner's suppression hearing confession. Once the TCCA decided that the suppression hearing confession would have been inadmissible if not for trial counsel's failure to object, it necessitated a review of additional evidence in order to determine if the failure was prejudicial. The TCCA did not misapply the federal law-of-the-case doctrine, and the TCCA did not unreasonably apply the prejudice prong of *Strickland*.

### 2. Insufficient Corroboration

Petitioner argues that without the suppression hearing confession, there was insufficient evidence to corroborate Petitioner's extrajudicial confessions. Under Tennessee law, Petitioner could not be convicted solely based on uncorroborated extrajudicial confessions. *Bishop*, 431 S.W.3d at 61. Arguments based on state law are not entitled to federal habeas corpus review unless the "alleged error independently violated the Constitution or laws of the United States." *Williams v. Chapleau*, No. 97-6015, 2000 WL 32015, at *4 (6th Cir. Jan. 4, 2000); *Combs v. Tennessee*, 530 F.2d 695, 698 (6th Cir.), *cert. denied*, 425 U.S. 954 (1976). The Constitution

15

does not demand that states require corroboration of a criminal defendant's extrajudicial admissions. *United States v. Brown*, 617 F.3d 857, 862 (6th Cir. 2010); *Williams*, 2000 WL 32015, at *4. Thus, Petitioner failed to state a claim upon which habeas corpus relief can be granted.

To the extent that Petitioner's argument is based on the constitutional sufficiency of all the evidence, and not just the corroboration requirement under Tennessee law, the proper standard is set forth in *Jackson v. Virginia*, where the Supreme Court held that evidence is sufficient to sustain a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Petitioner admitted to driving the car during the shooting, and the jury was instructed on criminal responsibility for an offense committed by the conduct of another. [Doc. 8-6 at 77]. A rational jury could have found that Petitioner was guilty of attempted first-degree murder and employment of a firearm during the commission of a dangerous felony. Thus, Petitioner is not entitled to relief.

### B. Severing the Offenses

Petitioner asserts trial counsel was ineffective for failing to move to sever his offenses related to the August 13, 2012 shooting from the offenses related to the August 15, 2012 shooting. When offenses are permissively joined, "the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1). Upon Petitioner's post-conviction appeal, the TCCA held that Petitioner did not have a right to sever the offenses:

> [T]he record shows these two shootings were part of a common scheme or plan because they occurred at the same location, took place only two days apart, and were committed because of the ongoing feud between the Petitioner and Devante Nail. Moreover, because evidence of each shooting was relevant to the material issue of the Petitioner's motive and intent to retaliate against Devante

16

> Nail, evidence of the first shooting would have been admissible in the trial of the second shooting, and vice versa. Because these shootings were part of a common scheme or plan and because evidence of one shooting would have been admissible in the trial of the other shooting, the Petitioner did not have a right to sever the August 13, 2012 offenses from the August 15, 2012 offenses.

*Campbell*, 2019 WL 5858141, at *16. Petitioner argues that the TCCA previously held that the shared motivation was insufficient to establish a common scheme or plan [Doc. 1 at 18], but the TCCA additionally relied upon the proximity in time and location of the two shootings to find the offenses properly joined. Accordingly, any motion to sever by counsel would have been futile, and trial counsel was not deficient for failing to raise a meritless motion. *Chapman v. United States*, 74 F. App'x 590, 593 (6th Cir. 2003) (counsel "is not required by the constitution to raise frivolous defenses or arguments to avoid a charge of ineffective representation").

Additionally, Petitioner was not prejudiced by the joinder of his offenses. Petitioner argues that the joinder allowed the jury to infer guilt based on a propensity to commit crimes. However, had the offenses been tried separately, the evidence from the shooting on August 13, 2012 would have been admissible in the trial for the later shooting. *See* Tenn. R. Evid. 401. Thus, the TCCA properly applied the *Strickland* standard, and Petitioner is not entitled to relief under § 2254.

### C. Jury Instruction

Petitioner asserts trial counsel was ineffective for failing to request two specific jury instructions. Had trial counsel requested the instructions, they would have been denied. Thus, trial counsel was not deficient, nor was his failure to request the jury instructions prejudicial, and Petitioner is not entitled to relief under § 2254.

Specifically, Petitioner claims that trial counsel should have requested a missing witness instruction for Devante Nail, Lakeshia Reynolds, Darlessa Clemons, and Tamichael Bennett. Under Tennessee state law, a missing witness instruction should not be given "where the only

17

object of calling such witness would be to produce corroborative, cumulative, or possibly unnecessary evidence[.]" *Dickey v. McCord*, 63 S.W.3d 714, 721 (Tenn. Ct. App. 2001) (quoting *Stevens v. Moore*, 24 Tenn. App. 61, 139 S.W.2d 710, 717 (1940). The testimony of the additional witnesses would have been cumulative to the testimony given by Brittaney Nail, so the request for a missing witness instruction would have been denied. *Id.* Trial counsel could not be ineffective for failing to request an instruction that would have been denied. *Chapman*, at 593.

Petitioner also claims that trial counsel should have requested solicitation of first-degree murder be included in the jury instructions as a lesser included offense of attempted first-degree murder. A defendant is guilty of solicitation if, "by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense, or attempts to command, request or hire another to commit a criminal offense, with the intent that the criminal offense be committed . . . ." Tenn. Code Ann. § 39-12-102(a). A lesser included offense instruction is not required where the evidence does not support it. *Goodwin v. Johnson*, 632 F.3d 301, 317–318 (6th Cir. 2011); *Bowling v. Parker*, 344 F.3d 487, 500 (6th Cir. 2003); *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001). While the TCCA agreed that solicitation of first-degree murder is a lesser included offense of attempted first-degree murder, *Campbell*, 2019 WL 5858141, at *18, there is no evidence in the record to suggest that Petitioner commanded, requested, or hired another to shoot at the residence. Trial counsel was not ineffective for failing to request the unsupported instruction, *Chapman*, at 593, and Petitioner is not entitled to relief under § 2254.

18
Case 3:20-cv-00394-JRG-DCP   Document 11   Filed 02/23/21   Page 18 of 20   PageID #: 3216

## IV. CONCLUSION

For the reasons set forth above, Petitioner has failed to establish that the TCCA's decision rejecting his ineffective assistance of counsel claims warrants relief under § 2254. According, the instant petition will be **DENIED,** and this action will be **DISMISSED**.

## V. CERTIFICATE OF APPEALABILITY

The Court must now consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

Reasonable jurists could not conclude that Petitioner has made a substantial showing of a denial of a constitutional right for his ineffective assistance of counsel claims such that they would be adequate to deserve further review. Accordingly, a **COA SHALL NOT ISSUE.** Also, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE ORDER WILL ENTER.**

ENTER:

                                        s/J. RONNIE GREER
                                   UNITED STATES DISTRICT JUDGE